WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020-1095
(212) 819-8200
Thomas MacWright
Richard Graham

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Jason N. Zakia (*pro hac vice* pending)
Laura L. Femino (*pro hac vice* pending)

*Attorneys for Gunel Bakhshiyeva*
*as Petitioner and Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| INTERNATIONAL BANK OF AZERBAIJAN, | ) Case No. 17-11311 |
| | ) |
| Debtor in a Foreign Proceeding.[1] | ) Chapter 15 |
| | ) |

**VERIFIED PETITION FOR RECOGNITION**
**OF THE AZERI RESTRUCTURING PROCEEDING AND MOTION**
**FOR ORDER GRANTING RELATED RELIEF PURSUANT TO**
**11 U.S.C. §§ 1515, 1517, AND 1520**

Gunel Bakhshiyeva, the duly-authorized foreign representative with respect to the

judicial reorganization proceeding (the "**Azeri Restructuring Proceeding**") pending in the

Nasimi District Court (the "**Azeri Court**") in the Republic of Azerbaijan ("**Azerbaijan**")

pursuant to Articles 57-11 through 57-12 (the "**Restructuring Provisions**") of the Law of the

Republic of Azerbaijan On Banks (the "**Azeri Law on Banks**") concerning the International

Bank of Azerbaijan ("**IBA**," the "**Bank**," or the "**Debtor**"), acting in the capacity of Foreign

---

[1]      The last four identifying digits of the Debtor's tax number in Azerbaijan are 1881.

Representative (as such term is defined in section 101(24) of the Bankruptcy Code) and by and through her undersigned U.S. counsel, White & Case LLP ("**White & Case**") respectfully submits this verified petition (the "**Verified Petition**") in the above-captioned chapter 15 proceeding (the "**Chapter 15 Proceeding**") in furtherance of the form of voluntary petition (the "**Form of Voluntary Petition"**) [ECF No. 1] filed concurrently herewith (this Verified Petition, together with the Form of Voluntary Petition, the "**Petition**") and hereby requests that the Court enter an order substantially in the form annexed hereto as Exhibit A (the "**Proposed Order**") pursuant to sections 1515, 1517, and 1520 of title 11 of the United States Code 11 U.S.C. §§ 101-532 (2012) (the "**Bankruptcy Code**[2]"), effecting the following (the "**Requested Relief**"):

    i.    recognizing the Petitioner as the Foreign Representative, as defined in section 101(24), of the Debtor's Azeri Restructuring Proceeding;

    ii.    granting recognition, pursuant to section 1517, of the Azeri Restructuring Proceeding as the Debtor's Foreign Main Proceeding, as defined in section 1502(4), and all relief included therewith as provided in section 1520; and

    iii.    granting such other and further relief as the Court deems just and proper.

In light of imminent risks to the Bank's day-to-day transactions with certain U.S. financial institutions, the Petitioner is simultaneously seeking relief on an emergency basis in its *Motion for Provisional Relief pursuant to 11 U.S.C. §§ 1519, 1521(a)(7), and 362* (the "**Motion for Provisional Relief**") [ECF 4].

In support of this request and the Motion for Provisional Relief, the Petitioner refers the Court to the statements contained in the *Declaration of Anar Karimov pursuant to 28 U.S.C. § 1746 in Support of the Petition for Recognition of the Azeri Restructuring Proceeding and Motion for Order Granting Provisional Relief* (the "**Foreign Counsel Declaration**") [ECF 3], which is submitted concurrently herewith and incorporated herein by reference.

---

[2]    Unless otherwise noted, all section references herein refer to sections of the Bankruptcy Code.

In its April 17 resolution to commence a restructuring proceeding (the "**Supervisory Board Resolution**"), IBA's supervisory board appointed Mr. Khalid Ahadov, Chairman of its Management Board, "to act as foreign representative or to appoint another person to act as foreign representative of the Bank with respect to any [foreign] recognition proceedings concerning [the Azeri Restructuring Proceeding]."   Supervisory Board Resolution at 3. Following issuance of the Azeri Commencement Order on May 4, 2017 formally commencing the Azeri Restructuring Proceeding, Mr. Ahadov subsequently appointed the Petitioner as foreign representative of the Bank with respect to its Azeri Restructuring Proceeding and granted her a power-of-attorney in a resolution dated May 5, 2017   (the "**Appointment and PoA**") to represent the Bank as such in any foreign recognition proceedings.   Copies of the Supervisory Board Resolution and a translation thereof are exhibited hereto as Exhibits B and C.  A copy of the Appointment and PoA, which was executed in English, is exhibited hereto as Exhibit D.  As such, the Petitioner is fully authorized to commence this Chapter 15 Proceeding on behalf of the Bank and to act as its Foreign Representative in such proceeding.

The Petitioner is an attorney qualified to practice law in Azerbaijan.  Ms. Bakhshiyeva graduated from the Baku State University with a bachelor's degree in international law and earned a Master's degree in Law and Economics at the University of Lausanne, Switzerland. She has served as a senior relationship manager at IBA since 2013.  She provide comprehensive legal services to the Bank with respect to its international business.  Her responsibilities include, *inter alia*, establishing relationships with banks outside of Azerbaijan, negotiating and structuring the terms of the Bank's financial indebtedness, preparing and reviewing legal documentation with respect to such financings, addressing foreign creditors' questions and updating them with respect to all aspects of the Bank's operations, and acting on behalf of the

Bank during court proceedings with respect to its financial indebtedness.

Ms. Bakhshiyeva is familiar with the Bank's history and day-to-day operations, assets, financial condition, business affairs, books and records, and restructuring efforts.  She has been involved in the Azeri Restructuring Proceeding in various manners from its inception, including in preliminary discussions with the relevant authorities (as discussed in greater detail below), analysis and determination of the Bank's strategy with respect to the restructuring, and the Bank's selection and appointment of various legal and financial advisors.  She also functions as one of the Bank's primary contacts with its U.S. and English counsel, White & Case, in the preparation and execution of recognition proceedings, including this Chapter 15 Proceeding.

## Preliminary Statement

IBA is the largest commercial bank in Azerbaijan. It plays a foundational role in the stability of Azerbaijan's banking system and, by extension thereof, the country's economic development.   IBA helps link Azerbaijan to the global economy.   The Bank maintains an international presence through subsidiaries in Russia and Georgia and representative offices in London and Frankfurt.  The Bank is also a member of World Economic Forum's Community of Global Growth Companies and various other international financial organizations.

IBA was established on December 30, 1992 under the laws of Azerbaijan as an open joint stock company with the primary purpose of commercial lending and borrowing.  The Bank is majority-owned by the government of Azerbaijan.

Throughout 2014-2016, the Bank and its customers were negatively impacted by adverse economic conditions that acutely affected the economy of Azerbaijan.  These included a drop in oil prices and the resulting devaluation of the Azerbaijani Manat (the "**AZN**").[3]  Despite several capital infusions from the government of Azerbaijan in 2014-2015 to ensure regulatory and debt-

---

[3]     As of May 4, 2017, 1 AZN = .6 USD.  XE Live Currency Exchange Rates, http://www.xe.com/ (May 4, 2017).

covenant compliance, the Bank suffered substantial losses in 2016.

To maintain the Bank's financial stability, IBA and the government of Azerbaijan arranged for the transfer of the Bank's non-performing assets from the Bank to an existing government-backed non-banking credit institution—a solution similar to the "good bank-bad bank" model utilized in the United States following the 2007 financial crisis.[4]

But these steps were not sufficient. In 2017, the Bank determined that it needed to restructure its remaining indebtedness in a formal proceeding. On April 17, 2017, IBA's Supervisory Board adopted the Supervisory Board Resolution authorizing the Bank to petition for the commencement of a voluntary restructuring proceeding under the Restructuring Provisions of the Azeri Law on Banks.

On May 4, following approval of the Bank's petition by the Azeri Financial Markets Supervisory Authority ("**FMSA**") (the Bank's principal financial regulator), the Azeri Court issued an order formally commencing the Azeri Restructuring Proceeding (the "**Azeri Commencement Order**"). A copy of the Azeri Commencement Order and a certified translation into English of the same are attached hereto as Exhibits E and F.

The Bank now seeks ancillary relief in this Chapter 15 Proceeding in order to (i) safeguard from attachment or set-off four U.S.-located "correspondent accounts" used to complete daily USD transactions with various other financial institutions (as further detailed below, the "**U.S. Correspondent Accounts**"); (ii) guard against burdensome U.S. lawsuits by

---

[4]    The "good bank-bad bank" structure is used to separate a financial institution from its troubled assets—those that are illiquid, non-performing or otherwise resulting in write-downs and depleting capital—thereby "cleaning up" the balance sheet of the "good bank" in order to restore investor confidence, raise new capital, resume normal lending and maintain solvency while the troubled assets are separately addressed. In a good bank-bad bank structure, a financial institution establishes a separate entity for its "bad" assets, which may be charged either with liquidating those assets or with the longer-term operating goal of managing those troubled assets. The bad-bank is typically funded by capital infusions from a governmental entity, again as seen in the U.S. in the 2008 bail-outs of Citigroup and Bank of America. See Morrison & Foerster LLP, "Good Bank-Bad Bank: A Clean Break and a Fresh Start," Feb. 18, 2009, available at https://media2.mofo.com/documents/20090218goodbankbadbank.pdf.

creditors during the course of the Azeri Restructuring Proceeding; and (iii) complete the restructuring of its USD-denominated debt by obtaining U.S. judicial recognition of the Azeri Restructuring Proceeding and, ultimately, the plan approved in such proceeding by vote of the Bank's creditors and confirmation order of the Azeri Court.

Accordingly, in support of the Azeri Restructuring Proceeding and to ensure the preservation of going-concern value through the uninterrupted continuation of operations, the Petitioner hereby seeks recognition of the Azeri Restructuring Proceeding as a foreign main proceeding.

## Background

### A.  History and Operations

#### i.    Formation

1.      IBA was established under the laws of Azerbaijan as a private entity in December 30, 1992, in the form of an open joint stock bank, with the primary purpose of commercial lending and borrowing.  The Bank received its banking license from the Central Bank of the Republic of Azerbaijan on its date of formation and has been in operation ever since.

2.      In October 2013, the Bank's shareholders approved a capital increase program in order to ensure compliance with capitalization ratios under Basel I and prudential standards (and, derivatively, covenants in certain of the Bank's debt facilities).  Accordingly, the Bank received several tranches of capital injections through 2014 and 2015, which increased ownership of the Bank by the government of Azerbaijan, primarily through holdings by the Azeri Ministry of Finance ("**Azeri MoF**") and CJSC Agrarcredit ("**Agrarcredit**"), a State-owned non-banking credit institution.  As of the Azeri petition date, the Azeri MoF held 76.73% of the Bank's equity and Agracredit held 14.56%.

6

*ii.    Management, Ownership, and Regulation*

3.      IBA is governed by its shareholders through their general meeting, at the policy level by its supervisory board (the "**Supervisory Board**"), and at the operational level by its board of directors (the "**Management Board**").

4.      The general meeting of shareholders operates as the supreme governing body of the Bank.  It enacts and amends the Bank's internal by-laws, approves its budget, and determines the Bank's policy regarding financial, reporting, administrative and human resource policy.

5.      The Supervisory Board determines the strategic goals of the bank but is not involved in day-to-day management.  Rather, it monitors the Bank's management and activities in a supervisory capacity.

6.      The Management Board manages the day-to-day operations of the Bank.  Its responsibilities include all matters not within the exclusive competence of the Supervisory Board or decided in the general meeting of shareholders.  Bank oversight also includes various internal committees, including asset-liability and risk-management groups, which operate with the primary function of satisfying the Bank's reporting obligations as mandated by the Azeri Law on Banks.

7.      Finally, the Bank is heavily regulated and monitored by governmental units, most significantly the Financial Market Supervisory Authority ("**FMSA**"), which was established with the goal of improving licensing, regulation and supervision of the Azeri banking system.  IBA, as all other Azeri banks, is dependent on an FMSA-granted license and subject to significant ongoing regulatory oversight.

### iii.    General Operations

8.      IBA is the largest commercial bank in Azerbaijan, with approximately one-third of the domestic market share on the basis of each of assets, total gross loans, and total customer deposits.  It plays a foundational role in the stability of Azerbaijan's banking system, as well as the country's economic development and its integration into the global economy.   IBA is the parent company of subsidiary banking corporations in Georgia, and Russia, and is the only entity in its affiliated group presently under restructuring.  IBA has no branch, office, or place of business at which deposits are received located in the United States.

9.      IBA is a full-service commercial bank offering a range of financial products and services via its network of 36 branches (all located in Azerbaijan), 42 sub-branches, 3 service outlets and 2 currency exchange points across the country, making the Bank one of the most geographically diverse among Azerbaijani banks and of critical importance to customers in the country's more remote regions.  Due to its diverse geographic network, the Bank is also one of the largest employers among banks in Azerbaijan, having 1,780 employees as of December 31, 2016.

10.      The Bank provides services to over 10,000 corporate clients, comprised almost entirely of companies operating in Azerbaijan.  Corporate banking includes project financing and the provision of credit facilities denominated in both Azerbaijani Manats ("**AZN**") and foreign currencies, predominantly U.S. dollars ("**USD**"), as well as transactional services including trade finance, foreign exchange and payment service loans.  The Bank is also actively involved in trade financing through a number of different instruments including letters of credit, guarantees and collections.  On account of its size and capabilities, the Bank facilitates a significant portion of Azerbaijan's total business activity, including its infrastructure projects.

11.    IBA is also the largest retail bank in Azerbaijan, with approximately 747,583 retail customers.  Its retail services feature a range of products including loans, debit and credit cards and deposit and current accounts.  The Bank has the largest number of payment cards in Azerbaijan and is the largest provider of money transfer services, measured by the value of transfers as of December 31, 2016.

12.    Finally, IBA has an international presence through subsidiaries in Russia (International Bank of Azerbaijan – Moscow) and Georgia (International Bank of Azerbaijan – Georgia), representative offices in London and Frankfurt, and its participation as a member of World Economic Forum's Community of Global Growth Companies.  It is presently a member of the Azerbaijan Banks Association (ABA), the Baku Interbank Currency Exchange (BICEX) and the Baku Stock Exchange (BSE).  The Bank is also a member of international organizations including the International Payment System of American Express, Banking Association for Central and Eastern Europe (BACEE), Global Growth Companies Community (GCC), World Economic Forum (WEF), SWIFT, MasterCard International, VISA International and Reuters.

     *iv.    U.S. Operations and the U.S. Correspondent Accounts*

13.    IBA's operations include a number of connections to the United States that render the Requested Relief critical to the successful completion of the Azeri Restructuring Proceeding.

14.    First, the Bank has issued USD-denominated, New York law-governed debt, namely, USD 715m in loan facilities with Cargill Financial Services International, Inc. ("**Cargill**" and, such loan facilities together, the "**Cargill Facilities**").  The Cargill Facilities total approximately 31% of the Bank's total Financial Indebtedness (as defined below).

15.    Second, the Bank maintains a number of U.S. bank accounts in New York that it uses in its daily operations.  As a foreign bank, IBA does not have an account with the U.S.

Federal Reserve.  It must therefore utilize correspondent accounts (the "**U.S. Correspondent Accounts**") at the New York branches of U.S.-based banks (the "**U.S. Correspondent Banks**") in order to transact in USD.  Specifically, the Bank maintains correspondent accounts at the Bank of New York Mellon ("**BNYM**") (the "**BNYM Correspondent Account**"); Citibank N.A. ("**Citibank**") (the "**Citibank Correspondent Account**"); JP Morgan Chase Bank N.A. ("**JPM**") (the "**JPM Correspondent Account**"); Deutsche Bank Trust Company Americas ("**Deutsche Bank**") (the "**DB Correspondent Account**").  When clients deposit USD with IBA, those dollars are predominantly held in one of the U.S. Correspondent Accounts through IBA's account with one of the U.S. Correspondent Banks.  IBA then utilizes the U.S. Correspondent Accounts to settle transactions in USD with other financial institutions.

16.    As of the Azeri petition date, IBA held a total of approximately USD 50m in the U.S. Correspondent Accounts, although this amount fluctuates significantly as the Bank carries out various USD transactions in the ordinary course of its business.  The Bank routinely transfers funds in and out of the U.S. Correspondent Accounts for a variety of business reasons, including: (i) transfers to fulfill customer transactions in USD, (ii) transfers to achieve better terms of service with the correspondent bank, (iii) transfers to reduce cost and maximize returns related to the USD accounts, and (iv) various other ordinary course transfers to optimize the Bank's foreign currency transactions.  Importantly, when the Bank's corporate clients send USD funds or direct their own transactional counterparties to send USD funds to their accounts with IBA, these additional funds are held by IBA in the U.S. Correspondent Accounts.  For this reason, at any time, IBA's large corporate clients could effect transfers that drastically increase or decrease the amounts in the U.S. Correspondent Accounts.

17.    The U.S. Correspondent Accounts are vital to the Bank's continuation as a going-

concern.  They allow the Bank to maintain USD deposits for its corporate clients and process transactions for those clients.   Critical clients whose businesses regularly require access to the U.S. Correspondent Accounts include the State Oil Company of the Azerbaijan Republic (SOCAR), British Petroleum (BP), Azerbaijani Railways, Azerbaijani Airlines, and companies involved in the Baku-Tbilisi-Ceyhan and South Gas Corridor projects.  Such projects relate to the Trans-Anatolian Natural Gas Pipeline and Trans-Adriatic Pipeline, which allow for Azerbaijan gas exports to Europe and are of great importance to the economy of Azerbaijan.

18.     Loss of access to these accounts would stop the Bank from transacting in USD. This could destroy the Bank's reputation and key client relationships and seriously call into question the Bank's ability to continue as a going concern.  That is why the Bank needs the Requested Relief.

### B.  Assets and Liabilities

19.     As of June 30, 2016, the Bank held a total of AZN 14.2bn in assets (8.34bn USD), consisting of 36.2% loans and advances to customers; 23.2% receivables from banks and other financial institutions; 20% receivables from Agracredit; 16.1% cash and cash equivalents; 2.7% other assets; and 1.8% real property, equipment and intangibles.   These assets include approximately USD 50m as of the Azeri petition date held in the U.S. Correspondent Accounts, although as noted, this amount fluctuates daily as the Bank uses these accounts to effect various USD transactions.

20.     As of June 30, 2016, the Bank's liabilities totaled AZN 13.6bn (7.99bn USD), consisting of:

    i.    60% customer accounts
    ii.    14.6% other borrowed funds
    iii.    12.3% due to other banks
    iv.    5.8% debt securities in issue

     v.     5.7% subordinated debt

    vi.     1.6% other liabilities

## C. Debt Structure

21.     In addition to its customer deposits, the Bank had financial indebtedness at the time of the Azeri petition date of USD 2.3 billion, consisting of the following substantial debt facilities (together, the Bank's "**Financial Indebtedness**"):

     i.     USD 715m in the Cargill Facilities;

    ii.     approximately USD 500m in English Law-governed bonds (the "**Eurobonds**");

   iii.     USD 256m and EUR 27m owed under English law-governed bilateral loans with Credit Suisse AG;

    iv.     USD 250m in private placement notes issued to Emerald Capital Limited, with recourse limited solely to the proceeds of a deposit placed by Emerald Capital Limited with the Bank, governed by English law;

     v.     a USD 205m syndicated loan, governed by English law, with Citibank as agent and various financial institutions as lenders;

    vi.     a USD 111m loan owed to FBME Bank Ltd. governed by the law of Istanbul;

   vii.     a USD 100m subordinated loan agreement governed by English law with Rubrika Finance Company as lender, with limited recourse (the "**Subordinated Loan**");

  viii.     EUR 86.8m and USD 1.9m in trade finance liabilities, including letters of credit with various financial institutions, governed by foreign (non-U.S.) law; and

    ix.     English law-governed bilateral loans with ABLV Bank, AS (USD 8m) and Sberbank of Russia (USD 20m).

22.     In addition, the Bank acts as depositee on a USD 1bn deposit from the State Oil

Fund of Azerbaijan ("**SOFAZ**"), the sovereign wealth fund of the Republic of Azerbaijan, that

is also subject to the Bank's Restructuring Proceeding (the "**Affected Deposit**").

### D.  Events Precipitating Commencement of the Azeri Restructuring Proceeding

##### i.   *Economic downturn in Azerbaijan*

23.     Beginning in 2014, the Bank and its customers have been negatively impacted by

adverse economic conditions.  This was driven by a steep decline in oil prices, which hit the

Azeri economy hard and led to a steep devaluation of the AZN.  This was particularly harmful to

the Bank, which faces substantial exposure to currency exchange risk.  This caused the Bank's

net interest expense to soar and a substantial net loss.

24.     To maintain the Bank's financial stability, the Government of Azerbaijan

arranged for the transfer of non-performing assets from the Bank and its consolidated

subsidiaries to Agrarkredit (Azerbaijan's non-banking credit company)—a solution similar to the

"good bank-bad bank" model utilized in the United States following the 2007 financial crisis.[5]

These measures were authorized by a July 15th, 2015 Presidential decree designed to improve

IBA's financial stability.  On August 11, 2015, IBA, Agrarcredit, the Azeri MoF and the Central

Bank of Azerbaijan IBA executed agreement memorandums for each tranche to transfer IBA's

problematic investments (those in default or at high risk of default) to Agrarcredit in a number of

tranches from 2015 to 2017.  As of the date of this Petition, a total of AZN 10 bn in assets have

been transferred, and Agrarcredit, through the support of the government of Azerbaijan, has

repaid this amount in full to IBA.

---

[5]     See supra, fn 4 for background on the "good bank-bad bank" structure and its use in the United States.

*ii.   Events of Default*

25.     Beginning in February of this year, the Bank began considering the possibility of utilizing a formal reorganization proceeding to restructure its financial indebtedness. In preparation for a potential restructuring, the Bank began negotiating with the key financial lenders whose claims would be subject to such a restructuring, including Cargill (the Bank's largest single creditor).

26.     The Bank entered into discussions with Cargill after the Bank failed to make payment of principal under certain of the Cargill Facilities due on March 13, 2017 (the "**Defaulted Cargill Facilities**"). On April 2, 2017, the Bank and Cargill entered into an amendment agreement with respect to the Defaulted Cargill Facilities (the "**First Cargill Extension Agreement**"). Under the terms of the First Cargill Extension Agreement, the maturity date of the Defaulted Cargill Facilities was extended from March 13, 2017 to April 12, 2017, in order to facilitate discussions on the terms of the proposed restructuring. On April 21, 2017, the Bank and Cargill entered into a second amendment agreement under which the maturity date was further extended to May 10, 2017 (the "**Second Cargill Extension Agreement**"). Throughout the course of the these extensions, the Bank continued to pay interest as it fell due under the terms of all the Cargill Facilities, and even to make certain interest payments due on the Defaulted Cargill Facilities in advance, pursuant to terms set forth in the First Cargill Extension Agreement and the Second Cargill Extension Agreement.

27.     Notwithstanding execution of the Second Extension Agreement, on May 4, 2017, commencement of the Azeri Restructuring Proceeding by order of the Azeri Court again triggered default under all of the Cargill Facilities. Additionally, expiration of the Second Extension Agreement on May 11, 2017 (the last day of the extension being May 10, 2017) will

result in a second event of default under the Cargill Facilities.

28.    Further, the Bank's defaults on the Cargill debt on March 13, 2017 and April 12, 2017 triggered cross-defaults on approximately USD 1.4bn of debt with other lenders as well. These cross-defaults were cured upon entry into the First Cargill Extension Agreement and the Second Cargill Extension Agreement, respectively; however, the defaults were triggered again on May 4, 2017 following commencement of the Azeri Restructuring Proceeding.  As a result of these and other event of default provisions triggered by the Azeri Commencement Order, the Bank is presently in default on substantially all of its Financial Indebtedness.

29.    In addition, on May 10, 2017 and in light of commencement of the Azeri Restructuring Proceeding, the Bank did not make payment of approximately USD 100m in principal (plus accrued interest) due under the Subordinated Loan, in order to ensure equal treatment of all creditors to be affected by the proposed restructuring.  This constituted a further event of default and cross-default on a substantial portion of the Bank's Financial Indebtedness.

*iii.    Creditor Negotiations*

30.    While the Bank has been engaged in substantial negotiations with Cargill, its largest creditor, as of the present date, the Bank remains uncertain that Cargill will continue to cooperate consensually in the Azeri Restructuring Proceeding and to refrain from taking adverse action against the Bank and its assets in the United States.

31.    First, following payment default by IBA on certain of the Cargill Credit Facilities on March 13, 2017, Cargill issued a notice of non-payment to the Bank on March 15, 2017 informing it of the default and requesting immediate payment of all outstanding amounts (the "**Cargill Notice of Non-Payment**").  At a subsequent meeting that took place in Singapore on March 28, 2017 to negotiate possible maturity date extensions, Cargill reiterated a willingness to

accelerate the debt and/or bring legal action against the Bank in the United States. Subsequently, Cargill required IBA to appoint an agent for service of process in New York as a condition to entering into the First Cargill Extension Agreement. Also as noted, the Second Cargill Extension Agreement expired following May 10, and there have been no discussions with Cargill as to executing a further extension or waiver of other defaults. Finally, while IBA has drafted and discussed with Cargill a non-binding term sheet, Cargill has yet to execute the non-binding agreement. This is another reason why the Bank needs the Requested Relief to protect its assets in the United States during the course of the Azeri Restructuring Proceeding.

### E.  Commencement of the Azeri Restructuring Proceeding

#### i.  *Commencement of the Azeri Restructuring Proceeding*

32.    In light of the various defaults described above and with the goal of achieving an efficient restructuring through a formal, court-supervised process, IBA's Supervisory Board on April 17, 2017 adopted the Supervisory Board Resolution under the Restructuring Provisions of the Azeri Law on Banks, resolving to petition to commence the Azeri Restructuring Proceeding. A detailed explanation of the Restructuring Provisions and applicable Azeri civil procedure law is set forth in the Foreign Counsel Declaration.

33.    Promptly following the decision of its Supervisory Board, the Bank submitted its Supervisory Board Resolution to FMSA, as required under the Restructuring Provisions. The Bank and FMSA then entered into a written restructuring agreement regarding the Bank's proposed restructuring (the "**FMSA Restructuring Agreement**") on April 18, 2017, and the Bank submitted to FMSA a written draft of its restructuring plan (the "**Draft Restructuring Plan**"), setting forth the objective and procedure proposed for its restructuring, including which of its liabilities were to be subject to restructuring (the "**Affected Claims**") and the proposed

modifications thereto.

34.     Under its Draft Restructuring Plan, IBA seeks to restructure all of its Financial

Indebtedness, which includes debts denominated in AZN and foreign currencies including

Eurobonds, private placements, bilateral loans, trade related loans as well as the Affected

Deposit.  Customer deposits, whether or not insured and regardless of currency denomination,

are not subject to the restructuring.  As detailed in the Foreign Counsel Declaration, the Draft

Restructuring Plan is subject to negotiation with and ultimate approval by creditors, as well as

confirmation by the Azeri Court.  See Foreign Counsel Dec. at ¶ 21.

35.     On April 18, 2017, FMSA issued a notice of its approval (the "**FMSA Approval**

**Notice**") with respect to the Draft Restructuring Plan, and on April 25, 2017, IBA applied to the

Azeri Court for commencement of the Azeri Restructuring Proceeding.  On May 4, 2017, the

Azeri Court issued the Azeri Commencement Order, which operated to immediately commence

the court-supervised Azeri Restructuring Proceeding.

        ii.     *Present Status*

36.     The Azeri Restructuring Proceeding is proceeding in accordance with Article 57-

11 of the Azeri Law on Banks.  Foreign Counsel Decl. at ¶ 8.  During the course of the Azeri

Restructuring Proceeding, the Bank continues to operate as a debtor-in-possession to preserve its

value as a going concern.  _The Bank to date has met all of its regulatory obligations under the

Azeri Law on Banks, and continues to have the full support of FMSA, which worked with IBA

prior to its filing to construct a fair and feasible restructuring plan and whose approval was

required for the Bank to submit its Azeri Petition.  As such, the Bank has every confidence that,

with the grant of comity and necessary ancillary support from this Court, it is poised to emerge

successfully from its restructuring.

## Additional Required Disclosures

37.     The Debtor has no other pending petition with the Court for relief under chapter 15 (other than the Petition) or any other chapter of the Bankruptcy Code.

38.     The Petitioner is not aware of any pending foreign proceeding other than the Azeri Restructuring Proceeding.

39.     Aside from the Petitioner, Mr. Khalid Ahadov was authorized to administer foreign proceedings of the Bank and to appoint other individuals to act as foreign representatives of the Bank's Azeri Restructuring Proceeding.  As described above, Mr. Ahadov appointed the Petitioner to act as Foreign Representative of the Bank with respect to the Azeri Restructuring Proceeding pursuant to the Resolution and PoA.  No other individuals are so authorized at this time.

40.     As of the date of the filing of this Petition, the Petitioner is not aware of any pending litigation involving the Bank in the United States.

41.     In conjunction with this Verified Petition and Motion for Recognition, the Petitioner is also seeking provisional relief, as detailed in the Motion for Provisional Relief, against each of the entities listed on Exhibit B to the *Application pursuant to Federal Rules of Bankruptcy Procedure 2002(m) and (q) and 9007 for Order Scheduling Hearing and Specifying Form and Manner of Service of Notice* (the "**Procedural Motion**") [ECF 6] submitted contemporaneously herewith.

## Jurisdiction, Eligibility and Venue

42.     This Court has jurisdiction to consider this Petition pursuant to sections 157 and 1334 of title 28 of the United States Code, as well as the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, In re Standing Order of Reference Re:  Title 11, 12

Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.) (the "**Amended Standing Order**").

43.     This case has been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of this Petition for recognition of the Azeri Restructuring Proceeding as a foreign main proceeding of the Debtor pursuant to section 1515 of the Bankruptcy Code.  This is a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code.

44.     Venue is proper in this Court pursuant to section 1410(1) of title 28 of the United States Code (stating that a case under chapter 15 of the Bankruptcy Code where debtor has principal U.S. assets or principal place of business), as the Debtor's principal U.S. assets, approximately USD 50m as of the Azeri petition date held in the U.S. Correspondent Accounts, are located within New York County and thus within this District.

45.     The presence of assets within the United States renders the Debtor eligible to file this Chapter 15 Proceeding pursuant to section 109(a) of the Bankruptcy Code.  See In re Suntech Power Holdings Co, 520 B.R. 399, 411 (Bankr. S.D.N.Y. 2014); Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet), 737 F.3d 238, 247 (2d Cir. 2013) (applying section 109(a)'s local property requirement to chapter 15 cases).

46.     Sections 1515, 1517 and 1520 of the Bankruptcy Code form the statutory predicates for the Requested Relief.

## Relief Requested

47.     The Petitioner requests that this Court enter an order, substantially in the form of the Proposed Order attached hereto and pursuant to sections 1515, 1517 and 1520 of the Bankruptcy Code:

    a)  recognizing the Petitioner as the Foreign Representative, as defined in section 101(24), of the Debtor's Azeri Restructuring Proceeding;

b) granting recognition, pursuant to section 1517, of the Azeri Restructuring Proceeding as the Debtor's Foreign Main Proceeding, as defined in section 1502(4), and all accompanying relief as provided in section 1520; and

c) granting such other and further relief as the Court deems just and proper.[6]

## Basis for Relief

### A. The Court Should Recognize the Azeri Restructuring Proceeding as the Foreign Main Proceeding of the Debtor, and the Petitioner as the Duly Authorized Foreign Representative thereof

48.     The purpose of chapter 15 is to "incorporate the Model Law on Cross-Border Insolvency (the "**Model Law**") so as to provide effective mechanisms for dealing with cases of cross-border insolvency."  11 U.S.C. § 1501(a).  Thus:

> The language of chapter 15 tracks the Model Law, with adaptations designed to mesh with United States law.  Congress prescribed a rule of interpretation that expressly requires United States courts to take into account the statute's international origin and to promote applications of chapter 15 that are consistent with versions of the Model Law adopted in other jurisdictions.

In re Pro-Fit Holdings Ltd., 391 B.R. 850, 857 (Bankr. C.D. Cal. 2008);  see also Krys v. Farnum Place, LLC (In re Fairfield Sentry Ltd.), 768 F.3d 239, 245 (2d Cir. 2014) (quoting 11 U.S.C. § 1501(a)); In re British Am. Ins. Co., 425 B.R. 884, 899 (Bankr. S.D. Fla. 2010).  Accordingly, in interpreting chapter 15, a court is to "consider its international origin, and the need to promote an application of [chapter 15] that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508.[7]

---

[6]     Pending this Court's decision on recognition of the Azeri Restructuring Proceeding, the Petitioner is also seeking  certain provisional injunctive relief pursuant to section 1519 of the Bankruptcy Code in a separate motion filed contemporaneously herewith.

[7]     The legislative history notes that "[i]nterpretation of [chapter 15] on a uniform basis will be aided by reference to the Guide [to Enactment of the UNCITRAL MODEL LAW on Cross-Border Insolvency, U.N. Gen. Ass., UNCITRAL 30th Sess. U.N. Doc. A/CN.9/442 (1997) (the "Guide")] and the Reports cited

49.     Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing, the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if (1) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code, (2) the foreign representative applying for recognition is a person or body, and (3) the petition meets the requirements of section 1515 of the Bankruptcy Code.  See 11 U.S.C. § 1517(a); In re Overnight & Control Comm'n of Avánzit, S.A., 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008).   These foregoing requirements are satisfied with respect to the Azeri Restructuring Proceeding, the Petitioner, and this Petition.

### a.  The Azeri Restructuring Proceeding is the Debtor's Foreign Main Proceeding

50.     The Azeri Restructuring Proceeding is a foreign main proceeding and as such satisfies the first condition for entry of an order recognizing such a proceeding under section 1517(a).

### i.   The Azeri Restructuring Proceeding is a "foreign proceeding"

51.     Section 101(23) defines a "foreign proceeding" as (1) a collective judicial or administrative proceeding relating to insolvency or adjustment of debt, (2) pending in a foreign country, (3) under the supervision of a foreign court and (4) for the purpose of reorganizing or liquidating the assets and affairs of the debtor.  See 11 U.S.C. § 101(23).  The Bankruptcy Code defines "foreign court" as "a judicial or other authority competent to control or supervise a foreign proceeding."  See 11 U.S.C. § 1502(3).

52.     The Azeri Restructuring Proceeding meets the definition of "foreign proceeding" set forth in section 101(23) of the Bankruptcy Code.  It is a "a collective judicial . . . proceeding in a foreign country . . . under a law relating to insolvency or adjustment of debt in which

---

therein, which explain the reasons for the terms used and often cite their origins as well."  H. Rep. No. 109-31, Pt. 1, 109th Cong., 1st Sess. 109-110 (2005).

proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization." 11 U.S.C. § 101(23).

53.    Section 1516(a) of the Bankruptcy Code entitles this Court to presume that a foreign proceeding is a "foreign proceeding," if the decision commencing the foreign proceeding so indicates. See 11 U.S.C. § 1516(a). Here, the Azeri Court in the Azeri Commencement Order acknowledged the decision of the Bank's Supervisory Board dated April 17, 2017 appointing a foreign representative with respect "to recognition proceedings" with respect to the Azeri Restructuring Proceeding. Azeri Commencement Order at 5. The Azeri Court thus has stated that the Azeri Restructuring Proceeding is a proceeding which is to be the subject of foreign recognition proceedings; therefore this Court is entitled to presume that the Azeri Restructuring Proceeding is a foreign proceeding of the kind encompassed by the section 101(23) definition of "foreign proceeding."

54.    The Azeri Restructuring Proceeding is <u>collective</u> in that it involves the treatment of multiple creditors and claims together rather than through the resolution of multiple two-party disputes, and in that it requires approval by creditors representing at least two-thirds (in claim amount) of the impaired claims in order to proceed. <u>See</u> Foreign Counsel Dec. at ¶ 19. As such, restructurings achieved under the Restructuring Provisions of the Azeri Law on Banks serve to directly or indirectly benefit all creditors collectively rather than to benefit any single creditor alone. <u>See</u> <u>id.</u>

55.    The Azeri Restructuring Proceeding is a <u>judicial proceeding</u> in that commencement of the proceeding, confirmation of a final plan of reorganization, and termination of the proceeding each require an order of the Azeri Court, a judicial body of Azerbaijan. <u>See</u> Foreign Counsel Dec. at ¶¶ 12, 21. The Azeri Restructuring Proceeding is further supervised by

an authorized agency, namely, FMSA, the primary regulatory authority of the Bank.  Id. at ¶ 9.

To that extent, FMSA is also acting as a "foreign court" within the definition of that term in

section 1502(3) of the Bankruptcy Code.[8]

56.     The Azeri Restructuring Proceeding is pending in a foreign country (Azerbaijan)

under a law relating to adjustment of debt, namely, the Restructuring Provisions of the Azeri

Law on Banks.  Id. at ¶ 8.  During the course of the proceeding, the Bank's assets and affairs are

subject to the supervision of FMSA as its primary regulator.   Additionally, the Azeri Court

exercises its authority over the Bank's restructuring through the issuance of orders commencing

and terminating the Azeri Restructuring Proceeding, as well as approving and confirming the

Azeri Plan.  Id. at ¶ 9.  As the Azeri Restructuring Proceeding is the first proceeding to be

commenced under the Restructuring Provisions of the Azeri Restructuring Law, its provisions

are a matter of first impression in the U.S. courts.   However, the Azeri restructuring proceeding

is very similar to several Kazakhstani bank restructuring proceedings that have been recognized

by this Court.  See, e.g., In re "BTA Bank" JSC, No. 12-13081 (JMP) (Bankr. S.D.N.Y. Aug. 16,

2012) (recognition order entered); In re JSC BTA Bank, No. 10-10638 (JMP) (Bankr. S.D.N.Y.

Mar. 2, 2010) (same); In re JSC Alliance Bank, No. 10-10761 (JMP) (Bankr. S.D.N.Y. Mar. 10,

2010) (same); In re JSC Alliance Bank, No. 14-13194 (SHL) (Bankr. S.D.N.Y. Dec. 22, 2014)

(same).  In each of these cases, a regulatory agency authorized commencement of proceedings,

and debtor banks negotiated a plan to restructure their financial liabilities, which was approved

by creditors voting two-thirds in amount of claims and subsequently approved by the court and

the supervisory regulatory agency.

---

[8]      "'Foreign Court'" means a judicial or other authority competent to control or supervise a foreign proceeding."
(emphasis added).

ii.   *The Azeri Restructuring Proceeding is a "foreign main proceeding"*

57.     In addition to constituting a "foreign proceeding" under section 101(23), the Azeri

Restructuring Proceeding is also the Debtor's "foreign main proceeding" because Azerbaijan is

the Debtor's center of main interests ("**COMI**").  See 11 U.S.C. § 1502(4); see also 11 U.S.C. §

1517(b)(1) (providing that an order of recognition as a foreign main proceeding shall be entered

if the foreign proceeding that is subject to the petition "is pending in the country where the

debtor has the center of its main interests").

58.     The Bankruptcy Code establishes a rebuttable presumption that a debtor's

"registered office" is its center of main interests.  See 11 U.S.C. § 1516(c).  In addition to this

presumption and aiding in a substantive inquiry, courts in this Circuit have developed a list of

"factors" a court may consider when determining a debtor's COMI.  These factors include:

> [T]he location of the debtor's headquarters; the location of those
> who actually manage the debtor (which, conceivably could be the
> headquarters of a holding company); the location of the debtor's
> primary assets; the location of the majority of the debtor's creditors
> or of a majority of the creditors who would be affected by the case;
> and/or the jurisdiction whose law would apply to most disputes….
> the principal place of business . . . [and] the expectations of third
> parties [as to] the debtor's COMI.

In re Fairfield Sentry Ltd., No. 10 Civ. 7311 (GBD), 2011 U.S. Dist. LEXIS 105770, at *10

(S.D.N.Y. Sep. 15, 2011) (citing In re Bear Stearns High-Grade Structured Credit Strategies

Master Fund, Ltd, 389 B.R. 325, 336 (Bankr. S.D.N.Y. 2008); In re SPhinX, LTD, 351 B.R. at

117; In re British Am. Isle of Venice, 441 B.R. 713, 720 (Bankr. S.D. Fla. 2010)).

59.     The Bank's place of incorporation and location of its registered office is

Azerbaijan, as evidenced its certificate of registry (the "**Certificate of Registry**") and a certified

translation, attached hereto as Exhibits G and H.  Azerbaijan is thus presumed to be the center of

its main interests.  This conclusion is further supported by the fact that the Bank is managed and

run from its headquarters in Baku, Azerbaijan, where its shareholders hold their general meetings; its supervisory board convenes; and its day-to-day management team is located. Company operations are directed from Baku; strategic and key operating and policy decisions are effected; cash management functions are maintained; corporate accounting, financial planning and tax services are provided; and capital expenditure decisions are made. As such, a substantive analysis of the Bank's COMI confirms the statutory presumption that its COMI lies in Azerbaijan.

### b. The Petitioner is the Duly Appointed Proper Foreign Representative of the Debtor's Azeri Restructuring Proceeding

60. The second requirement under section 1517(a) is that a foreign representative applying for recognition be a person or body. See 11 U.S.C. § 1517(a)(2). Section 101(24) of the Bankruptcy Code provides that

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

61. Again as a preliminary matter, section 1516(a) of the Bankruptcy Code entitles this Court to presume that an individual is a "foreign representative" if the decision commencing the foreign proceeding so indicates. See 11 U.S.C. § 1516(a). As noted above, the Azeri Court in the Azeri Commencement Order acknowledged that the Bank's Supervisory Board in its Supervisory Resolution had duly appointed Mr. Khalid Ahadov "as foreign representative with respect to recognition proceedings in potential jurisdictions" as well as "his authority to entrust these powers to other persons." Azeri Commencement Order at 5. This Court therefore is entitled to presume what the Azeri Restructuring Court has indicated, namely, that Mr. Ahadov

was duly authorized to delegate the role of foreign representative to any other individual.  As the Appointment and PoA shows, Mr. Ahadaov has so appointed the Petitioner to serve as foreign representative.

62.     As a further matter, the Petitioner satisfies the definition for a foreign representative set forth in section 101(24) of the Code.  The Petitioner is an individual, which is included in the term "person," 11 U.S.C. § 101(41).  The Petitioner has been duly appointed by the Debtor to act as foreign representative in accordance with section 101(24) and authorized to commence this Chapter 15 Proceeding.  As explained in the Foreign Counsel Declaration, the Azeri Law on Banks authorizes the Debtor to administer the reorganization of its assets and affairs.  See Foreign Counsel Dec. at ¶¶ 8-9.  As such, the Debtor in its capacity as a debtor-in-possession was able to appoint the Petitioner immediately following commencement of the Azeri Restructuring Proceeding.   For this reason, the Petitioner satisfies sections 101(24) and 1517(a)(2) of the Bankruptcy Code.  Ad Hoc Group of Vitro Noteholders v. Vitro, S.A.B., de C.V. (In re Vitro, S.A.B. de C.V.), 470 B.R. 408 (Bankr. N.D. Tex. 2012), aff'd, 701 F.3d 1031 (5th Cir. 2012) (holding that an individual appointed as foreign representative by the debtor's board in anticipation of a Mexican *concurso* proceeding, which contemplates "self-management" during the proceeding similar to that of a debtor-in-possession, fit within the scope of the Bankruptcy Code's definition of "foreign representative," and recognizing the individual as the foreign representative); see In re Oi S.A., Case No. 16-11791 (SHL) (Bankr. S.D.N.Y. June 2016) (finding that a foreign representative was duly appointed by the debtor immediately following commencement of the Debtor's Brazilian restructuring proceeding); OAS S.A., 553 B.R. 83, 93 (Bankr. S.D.N.Y 2015) (same, citing In re Vitro, S.A.B. de C.V., 701 F.3d 1031, 1046 (5th Cir. 2012)).

### c. The Petition Was Properly Filed under Sections 1504 and 1509 and Satisfies the Requirements of Section 1515

63.     The third and final requirement for recognition of a foreign proceeding under section 1517(a) is that the petition for recognition meets the procedural requirements of section 1515.  See 11 U.S.C. § 1517(a)(3).  Here, all of those procedural requirements are satisfied.

64.     First, the Petitioner properly commenced this Chapter 15 Proceeding in accordance with sections 1504 and 1509(a) by filing its petition with all documents and information required by sections 1515(b) and 1515(c).

65.     Second, in accordance with section 1515(b)(1)-(2) and (d), the Petitioner has submitted evidence, translated into English, of the existence of the Azeri Restructuring Proceeding and the appointment of the Petitioner as foreign representative thereof.  See Exhibits E and F (containing copies of the Azeri Commencement Order and a translation of the same into English, respectively) and Exhibit D (containing the Appointment and PoA).

66.     Finally, in accordance with section 1515(c) and Rules 1007(a)(4) and 7007.1 of the Federal Rules of Bankruptcy Procedure, the Petitioner has submitted in this Verified Petition all required disclosures regarding the Debtor.

*   *   *

67.     For all of the reasons set forth above, the Petitioner respectfully submits that all of the requirements of section 1517(a) have been satisfied and accordingly the Debtor is entitled to all of the relief provided under section 1520 of the Bankruptcy Code.[9]  Thus, the Petitioner respectfully asks that the Court enter the Proposed Order, attached hereto as Exhibit A, recognizing the Azeri Restructuring Proceeding as the foreign main proceeding of the Debtor.

---

[9]     Upon recognition of the Azeri Restructuring Proceeding as a foreign main proceeding, certain relief is automatically granted as a matter of right.  See 11 U.S.C. § 1520.  In particular, upon the Court's recognition of the Azeri Restructuring Proceeding as a foreign main proceeding, section 1520(a)(1) of the Bankruptcy Code triggers the stay provisions of section 362 with respect to the Debtor.

**B.  The Debtor is Entitled to the Automatic Relief under 11 U.S.C. § 1520**

68.     Section 1520(a) of the Bankruptcy Code sets forth a series of statutory protections that automatically result from the recognition of a foreign proceeding as a foreign main proceeding, see 11 U.S.C. § 1520(a), including the application of the protection afforded by the automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and to the Debtor's property that is within the territorial jurisdiction of the United States.  Given that the protections set forth in section 1520(a) flow automatically from the recognition of a foreign main proceeding under section 1517, the Petitioner respectfully submits that, if the Court recognizes the Azeri Restructuring Proceeding as a foreign main proceeding, no further showing is required.

**C.   The Relief Requested Is Not Manifestly Contrary to the Public Policy of the United States**

69.     Recognition of the Azeri Restructuring Proceeding as the foreign main proceeding and the granting of associated relief is not "manifestly contrary to the public policy of the United States."  11 U.S.C. § 1506.  The legislative history indicates that this "public policy" exception is narrow, to be invoked only when the "most fundamental policies of the United States" may be jeopardized by judicial action taken under chapter 15.  H.R. Rep. No. 109-31, pt. 1, at 109 (2005).  The exception has been interpreted as operating only to ensure that foreign proceedings receiving comity in the United States protect the same fundamental notions of fairness safeguarded under the Bankruptcy Code and other applicable U.S. law.  As one court put it, "[t]he key determination . . .  is whether the procedures used in [the foreign proceeding] meet our fundamental standards of fairness."  In re Metcalfe & Mansfield Alt. Invs., 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010).  Section 1506 does not require that law governing the foreign proceeding be identical to its U.S. law counterpart; rather, it only requires that fundamental U.S. law notions of substantive and procedural fairness be adequately protected.  See, e.g., In re Rede

Energia S.A., 515 B.R. 69, 104 (Bankr. S.D.N.Y. 2014) (rejecting arguments that it should deny comity on the basis that the foreign law is not identical to U.S. law).

70.     Here, recognition of the Azeri Restructuring Proceeding is consistent with the public policy of the United States and the goal of chapter 15 to afford comity to foreign insolvency proceedings.  First, the Restructuring Provisions of the Azeri Law on Banks permits a debtor bank to effect a voluntary plan of reorganization only if creditors holding at least two-thirds in the value of claims subject to the restructuring vote in favor.  Foreign Counsel Dec. at ¶ 19.  It enshrines a series of procedural protections that ensure adequate notice to creditors as well as the opportunity to object and be heard.  To facilitate participation by creditors outside of Azerbaijan, the law permits foreign creditors to appear at the creditors' meeting and to vote through representative proxies.  Id.  In addition, the proceedings under the Restructuring Provisions are also subject to the Azeri Civil Procedure Code, under which creditors are able to appeal decisions of the Azeri Court to the Baku Appellate Court.  Id. at ¶ 17.

71.     For all these reasons, the Azeri Restructuring Proceeding is governed by an equitable and orderly process that comports with the United States' standards of substantive and procedural fairness.  As such, the relief requested herein does not violate the public policy of the United States.  To the contrary, recognition of the Azeri Restructuring Proceeding as a foreign main proceeding follows the dictates of chapter 15 to foster comity and cooperation between this Court and the Azeri Court with the ultimate goal of a centralized forum for a judicially-supervised reorganization and an orderly administration of the Debtor's assets.  For these reasons, the Petitioner respectfully submits that the Requested Relief should be granted.

**Notice**

72.     Notice of this Petition has been provided to:

i. International Bank of Azerbaijan, OJSC International Bank of Azerbaijan, 67 Nizami str., Baku, AZ1005, Azerbaijan, as the Debtor in this Chapter 15 Proceeding, Attn: Mr. Khalid Ahadov
- Email service to:
  - khalid.ahadov@ibar.az

ii. Office of the United States Trustee for the Southern District of New York, 201 Varick Street, Suite 1006, New York, NY 10014, Attn: Andrea B. Schwartz
- Email service to:
  - USTP.Region02@usdoj.gov

iii. Cargill, Incorporated, PO Box 9300, Minneapolis, MN 55440-9300, Attn: David Robertson & Ross Hamou-Jennings
- Email service to:
  - David_Robertson@cargill.com
  - Ross_HamouJennings@cargill.com

iv. ABLV Bank of Luxembourg, S.A., 23 Elizabetes Street, Riga, LV-1010, Latvia, Attn: Frank Lendorf
- Email service to:
  - frank.lendorf@ablv.lu

v. Banca Monte Dei Paschi di Siena, Piazza Salimbeni, 3, Siena 53100 Italy, Attn: Paolo Scioscia
- Email service to:
  - paolo.scioscia@mps.it

vi. Landesbank Baden-Wurttemberg, Humboldtstr. 18D-04105 Leipzig Federal Republic of Germany, Attn: Kostyantyn Vdovenko
- Email service to:
  - Kostyantyn.Vdovenko@lbbw.de

vii. Export-Import Bank of Korea, 38 Eunhaeng-ro, Yeongdeungpo-gu, Seoul, 07242, South Korea
- Email service to:
  - huk9@koreaexim.go.kr

viii. Banco Popolare, C.so Vittorio Emanuele, 31 - 41121 Modena – Italy, Attn: Marco Greci
- Email service to:
  - marco.greci@bper.it

ix. Bayerische Landesbank, Muenchen, Brienner Straße 18, D-80333 Munich, Federal Republic of Germany, Attn: Helene Schiffelbein and Vadim Flon
- Email service to:
  - helene.schiffelbein@bayernlb.de

- o vadim.flon@bayernlb.de

x.  Commerzbank, Kaiserplatz, 60311 Frankfurt am Main, Federal Republic of Germany, Attn: Holger Kautzky, Johann Engbrecht, and Dennis Rangnau
    - Email service to:
        - o holger.kautzky@commerzbank.com
        - o johann.engbrecht@commerzbank.com
        - o Dennis.Rangnau@commerzbank.com

xi.  Credit Suisse AG, 1 Cabot Square London E144QJ United Kingdom, Attn: Madthav Patki, Galina Barakova, and Surjan Singh
    - Email service to:
        - o madthav.patki@credit-suisse.com
        - o galina.barakova@credit-suisse.com
        - o surjan.singh@credit-suisse.com

xii.  Emerald Capital Limited:SPV - Emerald Capital Limited, 53 Merrion Square, Dublin 2, Ireland, Attn: Lauren Carroll
    - Email service to:
        - o Lauren.Carroll@tmf-group.com

xiii.  Citigroup Centre, 33 Canada Square, Canary Wharf, London E14 5LB; Attn: Armin Lindtner
    - Email service to:
        - o armin.lindtner@citi.com

xiv.  FBME Bank Ltd., 90 Archbishop Makarios III Ave, 1077 Nicosia, Cyprus, Attn: Mr. Christakis Iacovides

xv.  Intesa Sanpaolo, Via del Corso, 226   00186 Roma, Italy; Attn: Claudio Basili
    - Email service to:
        - o claudio.basili@intesasanpaolo.com

xvi.  Komercni Banka A.S., Václavské nám. 42 114 07 Praha 1, Czech Republic; Attn: Michal Rehor
    - Email service to:
        - o michal_rehor@kb.cz

xvii.  Landesbank Berlin, Alexanderplatz 2 10178 Berlin, Federal Republic of Germany;  Attn: Eckehard Bohrisch
    - Email service to:
        - o eckehard.bohrisch@lbb.de

xviii.  Rabobank, Croeselaan 18, 3521 CB Utrecht, The Netherlands; Attn: Monique Albers
    - Email service to:

- o    Monique.Albers@rabobank.com

xix.    Sberbank of Russia, 19, Vavilova St., 117997, Moscow, Russia
- Email service to:
  - o    GBVittenberg@sberbank.ru
  - o    OYKuznetsov@sberbank.ru
  - o    LIMuratova@sberbank.ru

xx.    Societe Generale, 17, Cours Valmy, 92800 Puteaux, France; Attn: Stefan Euler, Virginie de la Serve, Teyba Gouliyeva
- Email service to:
  - o    stefan.euler@sgcib.com
  - o    virginie.de-la-serve@sgcib.com
  - o    teyba.gouliyeva@sgcib.com

xxi.    Rubrika Finance Company Limited, 5 Harbourmaster Place, IFSC, Dublin 1, Ireland

xxii.    State Oil Fund of Azerbaijan, Heydər Əliyev prospekti 165, Bakı AZ1029, Azərbaycan Respublikası, Attn: Rovshan Javadov
- Email service to:
  - o    RJavadov@oilfund.az

xxiii.    The Bank of New York Mellon, 225 Liberty Street, New York, NY 10286, Attn: Cihat Takunyaci
- Email service to:
  - o    cihat.takunyaci@bnymellon.com

xxiv.    Citibank, N.A., 153 East 53rd Street, 16/ F, Zone 19, New York, NY 10022, Attn: Jason Zullo
- Email service to:
  - o    jason.zullo@citi.com

xxv.    European Loans Agency, EMEA, Citibank Europe plc, UK Branch, 5th Floor, Citigroup Centre, 25 Canada Square, Canary Wharf, London E14 5LB, United Kingdom; Attn: Malgorzata Kowalewska
- Email service to:
  - o    malgorzata.kowalewska@citi.com

xxvi.    JPMorgan Chase Bank, N.A., 270 Park Avenue, New York, NY 10017; Attn: Tugrul Unsal
- Email service to:
  - o    tugrul.unsal@jpmorgan.com

xxvii.   Deutsche Bank Trust Company Americas, 60 Wall Street, New York, NY 10005; Attn: Tatjana Bock
- Email service to:
  o tatjana.bock@db.com

xxviii.   Bloomberg Finance L.P., 731 Lexington Avenue, New York, NY 10022; Attn: Alexander Artyomov
- Email service to:
  o aartyomov@bloomberg.net

xxix.   Wilmington Trust Company, 1100 North Market Street, Wilmington, DE 19890-1605
- Email service to:
  o mbrzoska@wilmingtontrust.com

xxx.   American Express Company, 200 Vesey Street, New York, NY 10285
- Email service to:
  o elena.b.fabeni@aexp.com

xxxi.   U.S. Chamber of Commerce, 1615 H Street NW, Washington, DC 20062-2000

xxxii.   Diners Club International, 2500 Lake Cook Road, Riverwoods, Illinois, 60015
- Email service to:
  o sandysanchez@discover.com

xxxiii.   Visa International Service Association, 900 Metro Center Blvd., Foster City, CA 94404
- Email service to:
  o nhajiyev@visa.com

## No Prior Request

73.   No previous request for the relief requested herein has been made to this or any other court.

## Conclusion

74.   WHEREFORE, the Petitioner respectfully requests that the Court: (a) enter the Proposed Order, upon notice and a hearing, substantially in the form attached hereto as Exhibit A, and (b) grant such other and further relief as may be just and proper.

Dated:  New York, New York
May 11, 2017

                            Respectfully submitted,

                            By:     */s/ Thomas MacWright*
                                     Thomas MacWright


                            WHITE & CASE LLP
                            1221 Avenue of the Americas
                            New York, New York 10020-1095
                            (212) 819-8200
                            Thomas MacWright
                            Richard Graham

                            Southeast Financial Center, Suite 4900
                            200 S. Biscayne Boulevard
                            Miami, Florida 33131-2352
                            (305) 371-2700
                            Laura L. Femino (*pro hac vice* pending)
                            Jason N. Zakia (*pro hac vice* pending)


                            *Attorneys for Gunel Bakhshiyeva*
                            *as Petitioner and Foreign Representative*

## VERIFICATION OF CHAPTER 15 PETITION

Pursuant to 28 U.S.C. § 1746, I, Gunel Bakhshiyeva, declare as follows:

I am the duly appointed foreign representative of the Debtor with respect to its Azeri Restructuring Proceeding, and as such am authorized to commence and act in this ancillary Chapter 15 Proceeding.

I have reviewed this Verified Petition and am adequately informed as to the information discussed herein, and believe that the factual allegations contained herein are true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: New York, New York
        May 11_____, 2017

Respectfully submitted,

_____

*Gunel Bakhshiyeva*