WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020-1095
(212) 819-8200
Thomas MacWright
Richard Graham

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
(305) 371-2700
Jason N. Zakia (admitted *pro hac vice*)
Laura L. Femino (admitted *pro hac vice*)

*Attorneys for Gunel Bakhshiyeva*
*as Petitioner and Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>INTERNATIONAL BANK OF AZERBAIJAN,<br><br>    Debtor in a Foreign Proceeding.[1] | Case No. 17-11311<br><br>Chapter 15 |

**FOREIGN REPRESENTATIVE'S REPLY TO OBJECTION**
**OF THE AD HOC GROUP OF NOTEHOLDERS**

Gunel Bakhshiyeva (the "**Foreign Representative**"), through her undersigned counsel, respectfully submits this reply (the "**Reply**")[2] to the objection (the "**Objection**") filed by an ad hoc group of holders of notes (the "**Ad Hoc Group**") issued by The International Bank of Azerbaijan ("**IBA**") to the *Verified Petition for Recognition of the Azeri Restructuring Proceeding and Motion for Order Granting Related Relief Pursuant to 11. U.S.C. §§ 1515, 1517, and 1520* [ECF 2] (the "**Verified Petition**") filed in the above-captioned chapter 15 case (the

---

[1] The last four identifying digits of the Debtor's tax number in Azerbaijan are 1881.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Verified Petition.

"**Chapter 15 Proceeding**").  In support of this Reply, the Foreign Representative respectfully states as follows:

## PRELIMINARY STATEMENT

1. IBA is the largest commercial bank in Republic of Azerbaijan and plays a crucial role in the stability of that country's banking system and economic development.  The Bank has over 750,000 customers in Azerbaijan and abroad, and provides a critical economic link between Azerbaijan and the rest of the world.  The Bank is pursuing a judicial reorganization proceeding (the "**Azeri Restructuring Proceeding**") that was commenced on May 4, 2017, and remains pending in the Nasimi District Court (the "**Azeri Court**") in Azerbaijan.  The Foreign Representative has requested customary relief that is vital to the preservation of the Bank's going-concern value and uninterrupted operations as the Bank seeks to reorganize through the Azeri Restructuring Proceeding.  The Verified Petition seeks an order recognizing that the Azeri Restructuring Proceeding is a foreign main proceeding in accordance with sections 1515 and 1517 of the Bankruptcy Code and the protections that automatically apply to such a proceeding by virtue of section 1520 of the Bankruptcy Code.

2. The Ad Hoc Group, which is comprised of several bondholders purporting to hold certain English-law governed bonds which together comprise less than 10% of the debts subject to the Azeri Restructuring Proceeding, filed the only objection to the Verified Petition.  By the Objection, the Ad Hoc Group asks this Court to deny this standard relief and leave the Bank's substantial U.S. assets in peril, thereby jeopardizing the Bank's business operations and the opportunity for a successful restructuring.  As this Court has already found, the absence of such relief would pose a threat of serious, irreparable harm to the Bank's operations and therefore its going-concern value.  See Preliminary Relief Order at ¶ K.

3.  There can be no dispute that the requirements for recognizing the Azeri Restructuring Proceeding have been satisfied and that the relief sought by the Verified Petition is appropriate.  The Objection does not compel a contrary conclusion.  Indeed, the Ad Hoc Group concedes that the "requests made of this Court are limited," Objection at ¶ 1, and the Objection itself fails to address any of the statutory predicates for the relief actually sought by Verified Petition (i.e., sections 1515, 1517, and 1520) or to contest that the requirements for recognition under section 1517 have been met.  Instead, the Objection bases its opposition to recognition on misplaced arguments concerning a restructuring process still underway and is founded entirely upon speculation as to events that have not yet occurred and questions not yet before this Court.

4.  Nor has the Ad Hoc Group offered any evidence to meet its heavy burden of proving that recognition of this foreign main proceeding will in any aspect be manifestly contrary to public policy.  Courts have recognized that the section 1506 standard is exceptionally difficult to meet, and is to be reserved for cases where this Court is being asked to do something "repugnant to U.S. law." In re Millard, 501 B.R. 644, 651 (Bankr. S.D.N.Y. 2013).  The Ad Hoc Group cannot meet that threshold here.  Instead of evidence, it presents nothing other than speculation as to how the Azeri Restructuring Proceeding might later offend U.S. public policy.

5.  Given the Ad Hoc Group's failure to contest the straightforward requirements for recognition and to prove that recognition would be manifestly contrary to public policy, the Objection should be overruled and recognition should be granted.

## **REPLY**

### A. The Verified Petition Meets the Requirements for the Limited Requested Relief

6.  The relief sought by the Voluntary Petition is limited to: (i) recognition of the Petitioner as Foreign Representative, (ii) recognition of the Azeri Restructuring Proceeding as

the Debtor's Foreign Main Proceeding pursuant to section 1517 of the Bankruptcy Code, and (iii) all automatic effects of recognition provided by section 1520 of the Bankruptcy Code (including application of the automatic stay) (the "**Requested Relief**"). See Verified Petition at ¶ 47. Notably, the Foreign Representative has **not** requested any discretionary relief pursuant to sections 1507 or 1521 of the Bankruptcy Code.[3]

7.  The Verified Petition satisfies the requirements for recognition and the Requested Relief should therefore be granted. Section 1517 of the Bankruptcy Code provides for recognition of a foreign proceeding as a foreign main proceeding if three simple requirements are met:

- The foreign proceeding is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502 of the Bankruptcy Code;

- The foreign representative applying for recognition is a person or body; and

- The petition for recognition meets the procedural requirements of section 1515 of the Bankruptcy Code.[4]

---

[3] Contemporaneously with the filing of the Voluntary Petition, the Petitioner filed a Motion for Provisional Relief Pursuant to 11 U.S.C. §§ 1519, 1521(a)(7), and 362 (the "**Motion for Provisional Relief**"). This Court granted the relief requested in the Motion for Provisional Relief by an order entered on May 15, 2017 [ECF 14].

[4] Section 1515 of the Bankruptcy Code provides:

(a)  A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

(b)  A petition for recognition shall be accompanied by—

(1)  a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2)  a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or
(3)  in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

(c)  A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

3

11 U.S.C. § 1517(a).

8.  For the reasons thoroughly set forth in the Verified Petition, the Petitioner has clearly satisfied the requirements in section 1517 for recognizing the Azeri Restructuring Proceeding as a foreign main proceeding. See Verified Petition at ¶ 67. No party – not even the Ad Hoc Group – contests that such requirements have been met. Recognition of the Azeri Restructuring Proceeding is therefore appropriate under section 1517 of the Bankruptcy Code and should generally follow as a matter of course. See In re Millard, 501 B.R. 644, 653-54 (Bankr. S.D.N.Y. 2013) ("[S]ection 1517(a) imposes a mandatory requirement, in the first instance, for recognition when its requirements have been met."); In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007) ("[T]he process of recognition of a foreign proceeding is a simple single step process . . . . The determination is a formulaic one.") (internal citations omitted); In re Basis Yield Alpha Fund (Master), 381 B.R. 37, 45-46 (Bankr. S.D.N.Y. 2008) ("Section 1517 of the [Bankruptcy] Code sets forth the requirements for an order granting recognition, and sets forth a statutory directive that (subject to an exception inapplicable here) when those requirements have been satisfied, a recognition order shall be entered. . . . [I]n contrast to the jurisprudence that developed under section 304 that emphasized discretion and flexibility . . . the new recognition regime under chapter 15 is procedurally quite rigid.").

9.  Section 1506 of the Bankruptcy Code provides for one exception to the otherwise inflexible rules mandating recognition once the requirements of section 1517 are met. Recognition may be denied if granting it would be "*manifestly* contrary to the public policy of the United States." 11 U.S.C. § 1506 (emphasis added). Importantly, this public policy

---

(d) The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The court may require a translation into English of additional documents.

exception is a narrow one. The Second Circuit has held that "[s]ection 1506 does not create an exception for *any* action under [c]hapter 15 that may conflict with public policy, but only an action that is '*manifestly* contrary.'" In re Fairfield Sentry Ltd., 714 F.3d at 139 (affirming recognition and finding that the public policy exception of section 1506 did not apply even though the foreign proceedings at issue were being conducted entirely in secret). Other courts have also consistently held that the public policy exception should be narrowly construed and applied sparingly. See, e.g., In re Sino-Forest, 501 B.R. 655, 65 (Bankr. S.D.N.Y. 2013); In re Qimonda AG Bankr. Litig., 433 B.R. 547, 567 (E.D. Va. 2010); In re Board of Dirs. of Telecom Arg. S.A., 2006 WL 686867, at *25 (Bankr. S.D.N.Y. Feb. 24, 2006) ("Comity does not require that the foreign law be a carbon copy of our law; rather, [it] must not be repugnant to the American laws and policies."); In re Millard, 501 B.R. 644, 651 (Bankr. S.D.N.Y. 2013) (section 1506 "is intended to be invoked only under exceptional circumstances concerning matters of fundamental importance for the United States") (quoting Lavie v. Ran (In re Ran), 607 F.3d 1017, 1021 (5th Cir. 2010)); In re Rede Energia S.A., 515 B.R. 69, 92 (Bankr. S.D.N.Y. 2014) ("[T]he public policy exception is clearly drafted in narrow terms and the few reported cases that have analyzed [section] 1506 at length recognize that it is to be applied sparingly.") (internal quotations omitted); In re Ephedra Prods. Liab. Litig., 349 B.R. 333, 336 (S.D.N.Y. 2006) (the public policy exception should be "narrowly interpreted, as the word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States"); In re Metcalfe & Mansfield Alt. Invs., 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (same); In re Gerova Fin. Grp., Ltd., 482 B.R. 86, 94 (Bankr. S.D.N.Y. 2012) (same).

10.    Accordingly, where the requirements of section 1517 have been met, objecting parties – such as the Ad Hoc Group – bear an exceedingly heavy burden to defeat recognition.

See Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.), 480 B.R. 129, 144 (S.D.N.Y. 2012) (holding that the opposing party did not meet its burden of demonstrating that granting recognition is manifestly contrary to U.S. public policy).

### B. The Requested Relief Is Not Manifestly Contrary to the Public Policy of the United States

11.    As described below, the arguments raised in the Objection are premature and fail to satisfy the Ad Hoc Group's heavy burden to demonstrate that the Requested Relief falls within the narrow public policy exception of section 1506.

#### a. The Ad Hoc Group's Objections Are Grounded in Speculation and Are Unripe

12.    The Objection should be overruled because its arguments rest on speculative facts that cannot serve as bases for denying the Requested Relief. Although the Ad Hoc Group has admitted that the Requested Relief is "limited" to recognition of the Azeri Restructuring Proceeding and the attendant relief associated with section 1520 of the Bankruptcy Code, Objection at ¶ 1, its arguments do not reference the statutory predicates for that relief, namely, sections 1515, 1517, and 1520.

13.    Instead, the Ad Hoc Group purports to raise issues under sections 1507 and 1522(a) of the Bankruptcy Code in respect of the plan process still unfolding in Azerbaijan.[5] Sections 1507(b) and 1522(a) of the Bankruptcy Code are not relevant to the Requested Relief, as those provisions apply exclusively as limitations to granting discretionary relief sought under sections 1507(a) and 1521 of the Bankruptcy Code – relief that has not been requested in connection with the Voluntary Petition and is not before the Court. Such arguments are therefore entirely misdirected.

---

[5] For example, the Objection refers to sections 1507(b) and 1522(a) of the Bankruptcy Code thirty-three (33) times in the body of the argument.

6

14. Although the Bank anticipates submitting a restructuring plan and a related information memorandum to its creditors in the near future, no plan has yet been submitted to creditors for their vote or to the Azeri Court for its approval. Nevertheless, the Objection invites the Court to contemplate a parade of speculative horribles regarding a tally of votes that have yet to be cast, the Azeri Court's treatment of objections not yet raised and its confirmation of a plan yet to be filed. Unsurprisingly, the Ad Hoc Group has submitted no evidence into the record – nor can it – to support its gloomy vision of events yet to occur in this restructuring.

15. The issues raised in the Objection are, therefore, not ripe for the Court's consideration, and the Objection itself amounts to a request for an improper advisory opinion regarding a hypothetical plan, vote, and order of the Azeri Court. Moreover, devoid of any developed record and rooted (as they are) in conjecture and rank speculation, the Ad Hoc Group has presented no facts which could possibly serve as a basis for concluding that recognition of the Azeri Restructuring Proceeding manifestly violates the public policy of the United States. To deny recognition on such a speculative basis would effectively widen the narrow public policy exception to include, as a grounds for denying recognition, creditors' fears as to eventual, unknown outcomes in foreign restructuring proceedings. Congress did not contemplate such an imprecise and unworkable standard.

    **b. Even if Ripe, the Issues Raised in the Objection Fail to Demonstrate that the Requested Relief Is Manifestly Contrary to the Public Policy of the United States**

16. Even if the Court were inclined to entertain the Ad Hoc Group's arguments at this time, such arguments fail to establish that recognition of the Azeri Restructuring Proceeding as a foreign main proceeding is manifestly contrary to United States public policy. At most, they serve to point out alleged dissimilarities between Azeri and U.S. law. But, as noted above and as

7

the Ad Hoc Group itself acknowledges, chapter 15 does not require a foreign insolvency proceeding to mimic U.S. bankruptcy law. Objection at ¶ 23. The public policy exception to recognition of a foreign proceeding is a narrow one that tolerates differences between U.S. and foreign insolvency law. See In re Rede Energia S.A., 515 B.R. 69, 92; In re Board of Dirs. of Telecom Arg. S.A., 2006 WL 686867, at *25 (Bankr. S.D.N.Y. Feb. 24, 2006) ("Comity does not require that the foreign law be a carbon copy of our law; rather, [it] must not be repugnant to the American laws and policies.").

17. Nevertheless, the Ad Hoc Group attempts to magnify differences between U.S. and Azeri law into grave public policy concerns by portraying the Azeri Restructuring Proceeding as a kind of scandal. It argues that U.S. and other foreign creditors are not given sufficient notice and opportunity to participate in the Azeri Restructuring Proceeding and are the victims of "targeted discrimination." As detailed below, the Ad Hoc Group's characterization is simply false. Not only does the Azeri Restructuring Law require notice to creditors, but as detailed in the *Supplemental Declaration of the Foreign Representative* filed contemporaneously herewith (the "**Supplemental Declaration**"), the Bank has gone above and beyond the requirements of the law in issuing notice of both its Azeri Restructuring Proceeding and this Chapter 15 Proceeding to affected creditors – a fact evidenced by the very filing of the Objection.

### i. *Creditors Are Afforded Due Process in the Azeri Restructuring Proceeding*

18. The Azeri Law on Banks, together with applicable rules of civil procedure, requires affected creditors be provided notice of the commencement of the Azeri Restructuring Proceeding, the plan of reorganization proposed by the Debtor, the creditors' meeting, and the confirmation hearing. Foreign Counsel Declaration at ¶¶ 18, 21. The law further includes

8

special measures for the protection of foreign creditors to ensure due process. Foreign Counsel Declaration at ¶ 18 (the law requires notice publication on the Bank's website as well as in an international publication, in addition to domestic notice); ¶ 19 ("In order to ensure that foreign creditors for whom travel to Azerbaijan may be difficult still have an opportunity to be heard and participate in the judicial process, the [Azeri Restructuring Law] provides that [a]ffected [c]reditors may attend the meeting . . . through authorized representatives."); ¶ 19 ("The [Azeri Restructuring Law] do[es] not discriminate between domestic and foreign Affected Creditors in voting, claim priority, or in any other manner'); ¶ 21 ("[T]he [d]ebtor [b]ank will provide notice of [the date of confirmation] hearing to all [a]ffected [c]reditors," and all such creditors "have an opportunity to object to the [plan] and be heard by the Nasimi District Court" at such confirmation hearing.); ¶ 22 (within three days of the completion of its restructuring proceeding, a debtor bank shall provide notice of such completion to FMSA and to all affected creditors).

19. Importantly, this Court should consider not only statutory provisions but also what notice in fact has been (and will be) provided. In the present case, the Bank has gone substantially above and beyond legal requirements to ensure due process is afforded to its creditors, in particular its international creditors and including the members of the Ad Hoc Group. These additional measures taken are set forth in detail in the Supplemental Declaration. First, in accordance with the Restructuring Provisions, a notice was published in two national publications in Azerbaijan and one international publication (the Financial Times), and the Bank issued a press release both on its website and on the Irish Stock Exchange on which the notes held by the members of the Ad Hoc Group are listed. Supplemental Declaration at ¶ 3. The Bank also provided the holders of such notes with notice of the commencement of the Azeri Restructuring Proceeding through the clearing systems for the notes. Id. In addition, the Bank

provided notice to all known affected creditors (whether located in or outside of the United States) of the commencement of the Chapter 15 Proceeding and of the order granting provisional relief, as well as all supplemental filings, by first class mail and by email.  See, Certificates of Service [ECF 12, 17].

20.    The Bank also issued press releases regarding the commencement of the Azeri Restructuring Proceeding and the Chapter 15 Proceeding, and informed affected creditors of an informational meeting held by the Bank in London on May 23, 2017.  Supplemental Declaration at ¶¶ 3-4.  At that meeting, the Bank's representatives described, among other things, the causes of the restructuring, the Bank's financial affairs and the outline of the draft restructuring plan.  See Objection, Exhibit B.  Over 361 persons registered to attend the informational meeting (144 in person and 217 by webcast), including 144 bondholder representatives and 139 bank representatives.  Various press organizations and rating agencies were also invited and attended.  Counsel for the Ad Hoc Group and each member of the Ad Hoc Group had representatives that also attended the meeting (almost all in person).  Supplemental Declaration at ¶ 4.

21.    The Bank will continue to provide notice to creditors as the restructuring matter progresses.  It is presently in the process of finalizing its proposed plan of reorganization in the course of ongoing discussions with its creditors.  In the near future, the Bank intends to announce the release of the plan and to distribute a comprehensive information memorandum to its creditors (akin to a disclosure statement in the United States), describing, among other things, the Bank's financial position, the terms of the plan and risk factors relating to the securities issued under the plan.  Supplemental Declaration at ¶ 5.  The plan and the information memorandum will be disseminated, and votes will be tabulated by, D.F. King Ltd., a leading global information, solicitation and tabulation firm.  Votes will be solicited in a manner consistent with

established international practices in capital markets, including those required under U.S. securities laws. Creditors will be able to submit their votes in person or by appointing a proxy (through a form of proxy included in the solicitation materials designating the chairman of the Bank or a proxy of their choice to vote on their behalf and according to their instructions). Id.

22. Following vote solicitation, the Bank will continue to comply with the notice provisions of the Restructuring Provisions and to ensure proper notice to its creditors, including adequate notice of the hearing on confirmation of the plan before the Azeri Court. Furthermore, the Azeri Restructuring Proceeding provides for the Azeri Court to conduct a hearing to consider confirmation of a reorganization plan. At such hearing, any affected creditor or other interested party will have the right to appear and object to approval of the plan on any grounds. Moreover, any decisions entered by the Azeri Court may be subject to appeals by any affected creditor or other interested parties. Foreign Counsel Decl. at ¶¶ 17 and 21, as cited in the Objection at ¶ 46.

23. The due process protections afforded to the Ad Hoc Group and the Bank's other creditors are more than sufficient to survive challenge under section 1506 of the Bankruptcy Code. This and other U.S. courts considering similar challenges, have found that foreign proceedings providing far less due process, including, in some instances, those providing no notice at all, were not manifestly contrary to U.S public policy. In re Fairfield Sentry Ltd., 714 F.3d at 139 (affirming recognition and finding that the public policy exception of section 1506 did not apply even though BVI bankruptcy proceedings were being conducted entirely in secret); In re "BTA Bank" JSC, No. 12-13081 (JMP) (Bankr. S.D.N.Y. Aug. 16, 2012) (recognizing Kazakhstani restructuring proceedings under a regime in which the only notice required was publication in domestic newspapers); In re JSC BTA Bank, No. 10-10638 (JMP) (Bankr. S.D.N.Y. Mar. 2, 2010) (same); In re OAS S.A., 553 B.R. 83, 103 (Bankr. S.D.N.Y 2015)

(finding that "Brazilian bankruptcy law meets our fundamental standards of fairness and accords with the course of civilized jurisprudence" even though the only notice required under Brazilian restructuring law is publication in the court's official gazette); In re Oi S.A., Case No. 16-11791 (SHL) (Bankr. S.D.N.Y. 2016) (same); In re Rede Energia S.A., No. 14-10078 (SCC) (Bankr. S.D.N.Y. March 6, 2014) (same); In re Independência S.A., No. 09-10903 (SMB) (Bankr. S.D.N.Y. Mar. 26, 2009) (same).

### ii. *The Azeri Restructuring Proceeding and the Azeri Law on Banks Do Not Target or Prejudice Foreign Creditors*

24. The Ad Hoc Group presents much innuendo but no evidence that the Restructuring Provisions in the Azeri Law on Banks target foreign creditors for inequitable treatment. The truth is that the Azeri legislature amended the Azeri Law on Banks to *protect* the Azeri banking system (and its creditors) by providing for a collective process to reorganize the heavy debt load of the country's banks. At the time of the law's enactment, IBA was the country's largest commercial bank and was facing likely defaults on several hundreds of millions of dollars of debt.[6] Absent enactment of the Restructuring Provisions, the Azeri legal system lacked a bank restructuring regime and required insolvent banks to be liquidated, an outcome even the Ad Hoc Group recognizes would be disastrous for the bank's creditors (including the members of the Ad Hoc Group), its customers and the Azerbaijani economy generally. Objection at ¶ 49 (conceding that liquidation is not an attractive alternative for creditors). Indeed, the

---

[6] Contrary to the Ad Hoc Group's statements, the Restructuring Provisions of the Azeri Law on Banks apply to all banks operating in Azerbaijan that are determined to be balance-sheet insolvent or likely not to be able to pay their debts – not just to the Debtor. The fact that the Bank is the first debtor to attempt to restructure under this new law should not be held against it.

emergency legal measures taken by the Azerbaijani legislature are similar to those effected in the United States in recent and parallel circumstances.[7]

25. The Ad Hoc Committee's complaint that the Azeri Law on Banks differs from general insolvency law governing the restructuring of other businesses is misplaced. Like the United States, Azerbaijan has recognized that

> [b]ank insolvencies are resolved differently primarily because banks provide a vital service in, among other things, issuing liquid deposits that tend to serve as money, extending credit, and processing payments. It is believed that any interruption in these activities, with resulting losses to participants, would have a more serious adverse impact on the economy of the insolvent bank's market area than any interruption in the operation of other insolvent firms.

See Robert R. Bliss & George G. Kaufman, *U.S. Corporate and Bank Insolvency Regimes: A Comparison and Evaluation*, 2 VA. L. & BUS. REV. 143, 145 (Spring 2007).

26. Further, the Azeri Law on Banks, on its face, draws no distinction between foreign and local creditors or between debt denominated in local or foreign currencies, see Foreign Counsel Declaration at ¶ 19, nor will the Bank's plan of reorganization. All creditors, both foreign and local, have the same rights to appear and object in the Azeri Restructuring Proceeding and in front of the Azeri Court. Id. Voting on the plan is open to all affected creditors, whether in person or through proxy, and solicitation of the affected bondholders and banks is being conducted consistent with customary international capital market practice and procedure.

---

[7] The recent amendment of the Azeri Law on Banks is comparable to similar legislative efforts in the United States and in many developed countries in the wake of the global financial crisis that seek to restructure (or in the case of the United States, allow for a managed liquidation of) banking institutions in a way that deals with the systemic economic risks associated with insolvent financial institutions. See, in the United States, Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (Pub. L. No. 111-203, 124 Stat. 1376 (2010)). See, also, In re Glitnir banki hf, No. 08-14757 (SMB), 2011 Bankr. LEXIS 3296, at *1 (U.S. Bankr. S.D.N.Y. Aug. 19, 2011) (recognition order entered for Icelandic proceedings under bank-specific restructuring law); In re "BTA Bank" JSC, No. 12-13081 (JMP) (Bankr. S.D.N.Y. Aug. 16, 2012) (recognition order entered for Kazakhstan Bank proceeding under bank-specific restructuring law); In re JSC BTA Bank, No. 10-10638 (JMP) (Bankr. S.D.N.Y. Mar. 2, 2010) (same).

27.     When claiming prejudice against foreign creditors, the Ad Hoc Group ignores the most important fact: that IBA has no Azeri-denominated debts other than its customer deposits and certain low-cost loans that allow the Bank to provide important business services to its customers at competitive rates.[8]  Thus, accusations of disparate treatment between Azeri-denominated and foreign debt are misplaced.  As for the customer deposits with the Bank, it is a near-universal criterion of bank reorganizations around the world that customer deposits, in whatever currency they are denominated, should to the extent possible remain unaffected.  The reason for this principle is plain: to prevent customers (of which there are more than 750,000 here) from precipitously withdrawing their deposits, destroying the going concern value of the Bank and undermining the banking sector. Excluding depositors from the restructuring proceeding can hardly raise any public policy concerns in this country, where domestic depositors have been afforded preference over other creditors in U.S. bank liquidation proceedings.[9]

28.     Finally, the Objection asserts – without basis – that the Azeri Restructuring Proceeding prejudices U.S. creditors.  Indeed, the Bank's largest U.S. creditor, Cargill (who

---

[8] Like its competitor banks in Azerbaijan, the Bank makes loans to Azeri startup companies (or small medium enterprises) by borrowing funds at a fixed margin of just one 1% through a program offered by a local entrepreneurship fund and charging the startup companies higher rates. Also, like its competitor banks in Azerbaijan, the Bank makes mortgage loans available to Azeri individuals by purchasing a mortgage portfolio from a governmental mortgage fund at fixed margins of 1% or 4% (depending on the type of mortgage) and servicing the mortgages, which are made to homeowners at higher rates. Each of the loans under these loan programs are denominated in local currency, and the bank's margins under each of these loan programs are the lowest margins of the Bank's fixed cost liabilities. As of the commencement of the Azeri Restructuring Proceeding, the bank owed approximately 176 million Azerbaijani Manat (or approximately USD$105 million) and 14 million Azerbaijani Manat (or approximately USD$8.2 million) under the startup loan program and mortgage loan program, respectively. If the Bank were to have subjected such loans to the Restructuring Proceeding, the Bank would have lost access to its lowest cost of capital and likely would have lost business to its competitor banks. Supplemental Declaration at ¶ 6.

[9] In 1993, Congress provided that claims of insured or uninsured domestic depositors of failed FDIC-insured banks should take precedence over claims of foreign depositors and, still further behind, general creditors. This is known as national depositor preference. See James A. Marino & Rosalind L. Bennett, The Consequences of National Depositor Preference, FDIC Banking Rev., Oct. 1999, at 19, available at https://www.fdic.gov/bank/analytical/banking/1999oct/2_v12n2.pdf.

14

holds approximately $750 million in debt), has signed a term sheet with the Bank expressing support for the Debtor's plan, has appeared in this case in the Chapter 15 Proceeding and has not objected to the relief requested in the Verified Petition.  Whereas, it appears that most – and perhaps all – of the members of the Ad Hoc Group (who hold less than one-third of the amount of debt held by Cargill) are based outside the United States.

### iii. *The Azeri Voting Process Is Not Manifestly Contrary to U.S. Public Policy*

29.    The Ad Hoc Group argues that due to the absence of separate classification and class-by-class voting, the Azeri Restructuring Proceeding is manifestly contrary to U.S. public policy because, in theory, the plan could be approved by the requisite 66% of claims in amount even where certain types of claims did not approve the plan by such threshold. Objection at ¶¶ 3, 30-34.  This is one of the issues that, as noted above, is obviously not ripe for consideration at this stage insofar as voting has not occurred.  Even in chapter 11 proceedings in the United States, courts typically will not entertain classification and cramdown objections until the confirmation hearing after voting on the plan has occurred and been tabulated. See, e.g., In re WorldCom, Inc., Case No. M-47 (HB), 2003 U.S. Dist. LEXIS 11160, at *25 (S.D.N.Y. June 30, 2003) ("Whether the proposed classification is improper is a matter to be decided at the confirmation hearing."); In re Ellipso, Inc., Case No. 09-00148, 2012 Bankr. LEXIS 565, at *5 (U.S. Bankr. D.D.C. Feb. 3, 2012) (deferring classification objection to confirmation); In re Sunshine Precious Metals, Inc., 142 B.R. 918, 920 (Bankr. D. Id. 1992) (deferring classification objection to confirmation); In re Cardinal Congregate I, 121 B.R. 760, 764 (Bankr. S.D. Ohio 1990) (finding objection to classification and treatment of claim as more proper for the confirmation hearing).

30.     Nonetheless, it is hard to fathom how the Azeri voting and classification process could be considered manifestly contrary to U.S. public policy when our own voting and classification system has been criticized for leading to gerrymandering and allowing a single class of claims holding a small economic interest to facilitate the cram down of the majority of a debtor's capital structure.  For example, a class of small trade creditors holding less than 5% of the total debt could, by accepting the plan, open the path to cram down the remaining 95%, even if the remainder voted unanimously to reject the plan.  By contrast, the Azeri process requires at least two-thirds of the amount of debt voting to approve a plan, and therefore, in many instances, is more protective of creditors and less subject to gamesmanship than the U.S. process.[10]

31.     Furthermore, the Objection is at odds with decisions of this Court that have, for example, recognized proceedings in which creditors voted in a single class.  This Court held that a Mexican insolvency law that did not envision class-by-class voting was substantially in accordance with and "largely mirror[ed]" the protections of dissenting creditors in the Bankruptcy Code where it required a majority vote of all creditors (i.e., 50.1% of the claims of secured, priority and unsecured creditors voting together as a single class) to approve the plan. In re Petition of Garcia Avila, 296 B.R. 95, 111-12 (Bankr. S.D.N.Y. 2003) (decided under former section 304 of the Bankruptcy Code).  See also In re Rede Energia S.A., 515 B.R. 69, 107 (granting recognition to restructuring plan in a Brazilian restructuring proceeding that required all unsecured creditors to vote in a single class despite differing treatment of certain unsecured claims).

---

[10] Indeed, the American Bankruptcy Institute Commission (the "Commission") recently concluded that section 1129(a)(10) should be eliminated from the Bankruptcy Code.  Even though the Commission "acknowledged the potential gating role served by section 1129(a)(10)," it "determined that the potential delay, cost, gamesmanship, and value destruction attendant to section 1129(a)(10) in all cases significantly outweighed its presumptive gating role." Final Report of the ABI Commission to Study the Reform of Chapter 11, 2014, p. 261 (noting the problematic issue of "the debtor or plan proponent strategically group[ing] claims to achieve at least one accepting impaired class of creditors").

### *iv.  The Ad Hoc Group's Constitution-Based Concerns Are Misplaced*

32. Citing no statutory basis, the Ad Hoc Group alleges that the Restructuring Provisions of the Azeri Law on Banks "contain[] none of the hallmarks of an insolvency law" because, according to the Ad Hoc Group, the law lacks due process. Objection at ¶¶ 41-45, 52.[11] Failing the Ad Hoc Group's manufactured standard of a proper insolvency law, the Objection characterizes the Azeri Law on Banks as little more than a mechanism to force a haircut on creditors in violation of the Takings, Contracts and Due Process Clauses of the United States Constitution. Id. at ¶¶ 51-53

33. That premise is flawed. Chapter 15 is not as narrow as the Ad Hoc Group has suggested, as made clear by the legislative history which expressly rejected the Ad Hoc Group's restrictive interpretation of what constitutes insolvency laws entitled to recognition. See H.R. Ref., No. 109-31, pt. 1, at 118 (noting that the "addition [of the term 'relating to . . . adjustment of debt . . . for the purpose of reorganization or liquidation' to the definition of 'foreign proceeding'] emphasizes that the scope of the Model Law and chapter 15 is not limited to proceedings involving only debtors which are technically insolvent, but broadly includes all proceedings involving debtors in severe financial stress . . ."). And the Supreme Court has long recognized that a large variety of evolving insolvency law is covered by the Bankruptcy Clause of the United States Constitution. Wright v. Union Cent. Life Ins. Co., 304 U.S. 502, 513 (1938) ("The subject of bankruptcies is incapable of final definition. The concept changes."). Such laws are exceptions to the Takings and Contracts clauses of the Constitution and are entitled to comity. See e.g., Canada Southern Ry. Co. v. Gebhard, 109 U.S. 527, 27 L. Ed. 1020, 3 S. Ct. 363 (1883) (ruling that a Canadian legislation passed with the specific purpose of adjusting the

---

[11] The Ad Hoc Group also complains that the Azeri Restructuring Proceeding inadequately protects security interests. That objection is irrelevant here given no secured claims will be impaired in the Azeri Restructuring Proceeding.

17

debts of a Canadian railroad corporation was not contrary to the Takings and Contracts Clauses). As demonstrated above, the procedural due process in the Azeri Restructuring Proceeding has and will be adequate. Moreover, comity does not require that foreign law adheres to the technical requirements of the United States Constitution. In re Ephedra Products Liability Litigation, 349 B.R. 333 (S.D.N.Y. 2006) (lack of right to jury trial in foreign proceeding not a bar to extending comity to foreign claims resolution procedure).

## CONCLUSION

For the foregoing reasons, the Foreign Representative respectfully requests that this Court overrule the Objection, grant the Verified Petition and grant such further relief as it deems just and proper.

Dated: New York, New York

June 16, 2017

          Respectfully submitted,

By:   */s/ Thomas MacWright*
      Thomas MacWright


WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020-1095
(212) 819-8200
Thomas MacWright
Richard Graham

Southeast Financial Center, Suite 4900
200 S. Biscayne Boulevard
Miami, Florida 33131-2352
(305) 371-2700
Laura L. Femino (admitted *pro hac vice*)
Jason N. Zakia (admitted *pro hac vice*)


*Attorneys for Gunel Bakhshiyeva*
*as Petitioner and Foreign Representative*